**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Albert THOMAS (92–4344); and**
**Angelique Dupree (93–3026),**
**Defendants–Appellants.**

**Nos. 92–4344, 93–3026.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 8, 1993.

Decided Dec. 14, 1993.

Marilyn A. Bobula, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Cleveland, OH, for plaintiff-appellee.

Donald Krosin (argued and briefed), Debra K. Migdal, Federal Public Defender's Office, Cleveland, OH, for defendant-appellant Albert Thomas.

Robert J. Marek (argued and briefed), Cleveland, OH, for defendant-appellant Angelique Dupree.

Before: MILBURN and BATCHELDER, Circuit Judges; and JOINER, Senior District Judge.*

MILBURN, Circuit Judge.

Defendants Albert Thomas (Case No. 92–4344) and Angelique Dupree (Case No. 93–3026) appeal their jury convictions of one count of possession of more than 50 grams of crack cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and one count of possession of a firearm in the commission of a drug distribution offense in violation of 18 U.S.C. § 924(c)(1), and also the sentences imposed thereon. On appeal, both defendants have raised the same issues. The issues are (1) whether the district court erred in denying defendants' motion to suppress the physical evidence seized at the time of their warrantless arrest, (2) whether the district court's jury instruction on aiding and abetting was plain error, and (3) whether the district court erred in determining at sentencing that the amount of drugs involved in the offense was in excess of 50 grams of crack cocaine. For the reasons that follow, we affirm the district court in both cases.

## I.

### A.

On July 7, 1992, a federal grand jury returned a three-count indictment against defendants. In count one of the indictment, both Thomas and Dupree were charged with intent to distribute 53.6 grams of cocaine base (crack cocaine) in violation of 21 U.S.C. § 841(a)(1). In count two of the indictment, Thomas was charged with using and carrying a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1). In count three of the indictment, Dupree was charged with using a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1).

Subsequently, defendants filed motions to suppress the evidence seized at their warrantless arrest. The district court held an evidentiary hearing on the motions on September 14, 1992; on September 17, 1992, the district court denied the motions to suppress.

A jury trial commenced on September 21, 1992. The trial concluded on September 23, 1992, when the jury returned guilty verdicts on all counts.

### B.

At approximately 10:00 p.m., on March 5, 1992, Cleveland, Ohio, police officers Gary Mullins and George Deli interviewed Lawrence Williams at the Cleveland Justice Center Jail, where Williams was in custody. Williams had been hospitalized at Charity Hospital as the result of multiple gunshot wounds to his mouth, foot, knee, and legs, which he received on or about 1:30 a.m. on February 16, 1992.

During the interview on March 5, 1992, Williams informed the officers that defendant Thomas was the individual who shot him after an altercation at Mr. B's Bar on Woodland Avenue in Cleveland, Ohio. Williams gave the officers an accurate physical description of defendant Thomas; namely, that Thomas was a black male in his late 20's to early 30's, medium height, husky build, with medium length hair with a wave in it. Further, Williams provided a detailed description of Thomas' truck; namely, a 1978–1980 black Chevrolet pickup with large tires and white rims, steps on the sides of the truck, and a temporary license plate tag in the window. Williams advised the officers that Thomas usually parked the pickup at the Longwood Estates parking lot on Woodland Avenue, between East 37th and 40th Streets in Cleveland. Williams also stated that Thomas frequented the area of Mr. B's Bar.

Williams described the shooting incident as an argument which began in Mr. B's Bar and moved outside the bar. Williams told the officers that Thomas pulled a large blue steel revolver that looked like a .357 magnum and

---

* Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

that he and Thomas engaged in a physical struggle over the gun. Thomas shot Williams once with the gun, at which point Williams took possession of the gun and expelled the remaining rounds. Thereafter, Thomas pulled out a .38 caliber chrome revolver and shot Williams in the foot and mouth.

The following day, Officers Mullins and Deli checked the computerized records of the Cleveland Police Department and verified that defendant Thomas was the named suspect in the incident report regarding the February 16, 1992, felonious assault on Williams. The report also revealed that a guard at Mr. B's Bar corroborated Williams' descriptions.

That same day, March 6, 1992, between 11:10 p.m. and 11:40 p.m., Officers Deli and Mullins drove an undercover car to the parking lot identified by Williams where they observed a pickup truck fitting the description given by Williams parked there. A check of the temporary tag in the window of the truck revealed that the pickup truck was registered to "Billy Thomas." Officers Deli and Mullins continued their routine patrol activities, periodically checking the parking lot and the area in front of Mr. B's Bar.

At approximately 1:05 a.m. on March 7, 1992, the officers observed the pickup truck parked in front of Mr. B's Bar. The officers then set up a surveillance of the pickup using binoculars. They observed two occupants in the pickup, defendant Dupree and Kevin Lanier. Defendant Dupree was seated in the middle of the pickup truck and Lanier was seated on the right side of the pickup truck.

The officers then observed defendant Thomas, who matched the description given by Williams, exit the bar and enter the driver's side of the pickup truck. Thomas made a U-turn onto eastbound Woodland Avenue and then made a left turn on East 55th Street. The officers followed closely behind the pickup truck. They activated the lights on their car, both the blue "gumball" light and the "bright" headlights, in order to direct the pickup truck to pull over. The officers observed Thomas looking at them in the rearview mirror as he led them through several turns before pulling over. They also observed Thomas and Dupree moving from side to side within the pickup truck, and Thomas was also observed bending over and leaning forward as he drove the truck. At trial, the officers testified that they were less than thirty feet behind the pickup truck, and with their headlights on "bright," they could see everything that was going on inside the pickup truck through the large rear window of the vehicle.

Defendant Thomas finally brought the pickup truck to a stop. Officers Deli and Mullins exited their vehicle and identified themselves as police. Officer Mullins approached the driver's side of the pickup truck and asked defendant Thomas for his identification. As he did so, Officer Mullins shined his flashlight into the cab of the pickup truck and observed the wooden handle ("butt end") of a gun sticking out from under the driver's seat. He advised Officer Deli, who was on the other side of the vehicle, of the gun, and the occupants were ordered to exit the vehicle. Defendant Thomas was told to exit the driver's side of the vehicle, and defendant Dupree and Kevin Lanier were told to exit from the passenger's side. Officer Mullins then seized the gun which he had seen—a large blue steel revolver, which is the basis of count two of the indictment. The revolver was fully loaded with six rounds of live ammunition and matched the description of the blue steel revolver given by Williams to the officers.

Mullins performed a pat-down search of Thomas and discovered a pager on his belt and $455 in cash in his pocket. Once Thomas had been identified, he was arrested for felonious assault and for carrying a concealed weapon. Dupree was also arrested for carrying a concealed weapon, since the gun observed by Officer Mullins was within her reach from her seat in the middle of the pickup truck. Further, Dupree was noticeably nervous when she was asked to exit the truck.

Before placing Dupree in the patrol car with her purse, Officer Mullins made a limited search of her purse, solely for the purpose of confiscating any weapons which were in the purse, from which he recovered a .38

caliber chrome revolver which was fully loaded with five rounds of live ammunition. This gun also matched the description given by Williams of the second gun and forms the basis of count three of the indictment.

Thomas, Dupree, and Lanier were transported to the police station for booking. At that time, an inventory of Dupree's possessions was completed. The purse contained a glass pipe, a straight shooter used for smoking crack cocaine and which contained cocaine residue, and some cocaine wrapped in a piece of brown paper.

Subsequently, the pickup was inventoried at the arrest scene. It was then towed from the scene and held as a criminal tool. A firebox, a small safe which weighed between 15 and 20 pounds, was located in a purple vinyl tote bag on the seat of the pickup truck. The firebox was locked; however, one of the keys on the key ring which was located in the ignition of the pickup truck opened the firebox. The police inventoried the firebox and found that it contained 46 live .38 caliber bullets, four separately packaged "baggies" of crack cocaine, three black plastic film cases with cocaine residue, $1,000 in United States currency, and various other documents addressed to either Thomas or Dupree. No documents in the firebox were addressed to Kevin Lanier. The approximately 53.6 grams of crack cocaine (cocaine base) had a street value, in Cleveland, Ohio, of between $10,700 and $13,000.

Defendant Dupree testified at trial. She testified that she was 24 years old, had a two and one-half year old daughter and had completed two and one-half years at Cleveland State University. Dupree testified that she was a drug addict but not a dealer or seller. She testified that she had purchased drugs from Kevin Lanier for her own use. She stated that she owed money to Lanier and that she gave him $100.00 in food stamps in exchange for drugs. Dupree also admitted that she had knowledge of a small amount of cocaine in her purse as well as the straight shooter; however, she denied any knowledge of the crack cocaine which was located in the firebox. She stated that she did not even know the firebox was in the pickup truck.

At trial, Eugenia Johnson–Whitt testified as an expert witness for the government. Ms. Johnson–Whitt is a scientific examiner at the City of Cleveland Forensic Laboratory; she testified that she examined, weighed, and tested the substances in the four separately packaged baggies which were seized from defendants on March 9, 1992. Ms. Johnson–Whitt testified that she determined that the substance in the baggies was cocaine base (crack cocaine) and that the substance had a total weight of 53.6 grams. She further testified that during her testing procedures, she used 16 samples of the crack cocaine and that each of these samples was destroyed as part of the testing. Ms. Johnson–Whitt testified that she did not weigh each of the samples which she used during her testing; however, she testified that she needed at least a minimum of .10 gram of sample for each of the 16 tests she performed. Thus, she estimated that she used up or destroyed at least 1.6 grams of crack cocaine as part of the testing procedure. Ms. Johnson–Whitt also testified that after she finished her testing, the baggies of crack cocaine were resealed and placed in the forensic laboratory's vault.

Ms. Johnson–Whitt was extensively cross-examined. Specifically, she was asked about the discrepancy between the total weight she determined for the crack cocaine and the total weight of crack cocaine which was determined by an independent defense expert. The independent defense expert weighed the crack cocaine from the four baggies at the City of Cleveland Forensic Laboratory in September 1992. He determined that the total weight of the crack cocaine was approximately 49.6 grams.

Subsequently, after defendants were found guilty, they challenged the government's assertion in the presentence investigation report that the total amount of crack cocaine or cocaine base involved in the offense was 53.6 grams. Essentially, defendants argued that because their independent expert determined that the total weight of the crack cocaine in September 1992 was 49.6 grams, they should be given the benefit of the doubt and that the lower weight, e.g., less than 50 grams of crack cocaine, should be used, which would result in their base offense level being two

levels lower than the base offense level for more than 50 grams of crack cocaine.

At the sentencing hearing, the government called Catherine Denissoff as a witness. Ms. Denissoff is also a scientific examiner for the City of Cleveland. She testified that she works with Ms. Johnson–Whitt at the forensic laboratory, and she observed Ms. Johnson–Whitt weigh the samples on March 9, 1992, and that the weight was 53.6 grams. Further, Ms. Denissoff testified that she reweighed the samples again in December 1992, three months after the reweighing by the defendants' independent examiner and that she determined that the total weight of the crack cocaine was 49.25 grams. Ms. Denissoff testified that the reason for the weight loss between September and December was evaporation of moisture from the crack cocaine. She further testified that she would expect that some of the weight loss between the weighing by Ms. Johnson–Whitt in March 1992 and the weighing by the defendants' independent expert in September 1992 was also due to evaporation. Ms. Denissoff also testified that other variables could have contributed to weight loss, such as each time the substance was reweighed a small amount of the substance would adhere to the weight boat used to weigh the samples. Following the hearing, the district court determined by a preponderance of the evidence that the weight of the crack cocaine was over 50 grams.

Following an evidentiary hearing on December 8, 1992, Thomas was sentenced to 120 months of incarceration on count one as well as a mandatory consecutive 60–month sentence on count two, to be followed by five years of supervised release. A timely appeal by defendant Thomas followed.

Defendant Dupree was sentenced on December 30, 1992. Following evidentiary sentencing hearings on December 14, 1992, and December 28, 1992, Dupree was sentenced to 121 months imprisonment on count one and a mandatory consecutive 60–month sentence on count two, to be followed by five years of supervised release. A timely appeal by defendant Dupree also followed.

## II.

### A.

Both defendants Thomas and Dupree challenge the district court's finding that there was probable cause for their warrantless arrests. Officer Mullins was the only witness to testify at the evidentiary hearing concerning defendants' motions to suppress. Following the hearing, the district court concluded that Officer Mullins had probable cause to arrest Thomas for felonious assault and that the probable cause allowed the warrantless arrest of defendant Thomas and which included the stopping of the pickup truck being driven by Thomas. The district court further found that the lawful arrest of Thomas permitted a search, incident to the arrest, of the front seat area of the pickup which justified the seizure of the handgun under the front seat of the pickup truck as well as the search of the firebox in the front seat of the pickup. The district court found that the search of the firebox was a valid inventory search and also valid as a search incident to arrest under *Belton v. New York,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). Finally, the district court stated that the "predicate for [its] rulings denying the motion to suppress [was] the determination that the testimony of Officer Mullins [was] credible." J.A. 23. The district court stated that "after carefully considering the testimony of Officer Mullins, the court found his testimony credible as bolstered by the existence of the incident report." J.A. 24.

Defendant Thomas argues that the district court erred in finding that there was probable cause for his warrantless arrest for felonious assault. However, he also concedes that "[i]f the district court was correct in holding that there was probable cause for the arrest of defendant Thomas, then the motion to suppress was probably correctly overruled in view of the authorities cited by the district court." Appellant's Brief (Thomas) at 8.

Defendant Dupree argues that her motion to suppress should have been granted because Officer Mullins did not arrest her for carrying a concealed weapon based upon the handgun which was under the front seat of the pickup truck, but rather arrested her

based upon the handgun which was seized from her purse. Dupree asserts that the search of her purse was not a valid search incident to a lawful arrest. However, Officer Mullins specifically testified that defendant Dupree was arrested for carrying a concealed weapon based upon the gun "under the seat" and "her readability or access to that gun." J.A. 126.

In reviewing a district court's determinations on suppression questions, a district court's factual findings are accepted unless they are clearly erroneous; however, the district court's application of the law to the facts, such as a finding of probable cause, is reviewed de novo. *United States v. Ogbuh,* 982 F.2d 1000, 1002–03 (6th Cir.1993).

An arrest is constitutionally valid, if "at the moment an arrest was made, the officers had probable cause to make it." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Probable cause exists when "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Id.* Probable cause "has come to mean more than bare suspicion," but " 'less than evidence which would justify condemnation' or conviction." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949) (quoting *Locke v. United States,* 7 Cranch 339, 348, 3 L.Ed. 364 (1813)).

This case is remarkably similar to the situation presented in *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). In *Hensley,* the Covington, Kentucky, police stopped Hensley's car based upon a wanted flyer received from a police department in another jurisdiction. As one of the officers approached Hensley's car "with his service revolver drawn and pointed into the air," another officer "stepped up to the open passenger door of Hensley's car and observed the butt of a revolver protruding from underneath the passenger's seat." *Id.* at 224, 105 S.Ct. at 678. At that point, the passenger in the automobile was arrested, and following a search of the passenger compartment of the car which revealed two addi-

tional handguns, Hensley was arrested. *Id.* After the dismissal of state charges, Hensley was indicted by a federal grand jury for being a convicted felon in possession of firearms. Subsequently, Hensley sought to suppress the firearms.

The Supreme Court determined that the stop of Hensley's car by the Covington police was a valid *Terry* stop, and that having validly stopped Hensley, the "police were entitled to seize evidence revealed in plain view in the course of the lawful stop, to arrest Hensley's passenger when evidence discovered in plain view gave probable cause to believe the passenger had committed a crime, ... and subsequently to search the passenger compartment of the car because it was within the passenger's immediate control." *Id.* at 236, 105 S.Ct. at 684. Furthermore, "having discovered additional weapons, ... officers had probable cause to arrest Hensley himself." *Id.* at 236, 105 S.Ct. at 684.

The *Hensley* Court explained that in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that "consistent with the Fourth Amendment, police may stop persons in the absence of probable cause under limited circumstances." *Hensley,* 469 U.S. at 226, 105 S.Ct. at 679. An officer has the authority to make a *Terry* stop "when the officer has reasonable, articulable suspicion that the person *has been,* is, or is about to be engaged in criminal activity." *Id.* at 227, 105 S.Ct. at 680 (quoting *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)). Where the police seek to locate a person suspected of involvement in a past crime, "the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice." *Id.,* 469 U.S. at 229, 103 S.Ct. at 680. "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Id.* "*Terry* clearly holds that a brief stop of a suspicious individual to deter-

mine his identity ... is permissible." *United States v. Roach,* 958 F.2d 679, 682 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 135, 121 L.Ed.2d 88 (1992). Further, a *Terry* stop is permissible where a crime has been completed and where the information supplying the reasonable suspicion came from another person rather than the officer's personal observation. *United States v. Barnes,* 910 F.2d 1342, 1343 (6th Cir.1990).

■ In this case, Officers Mullins and Deli had specific and articulable facts which constituted a reasonable suspicion that defendant Thomas had committed the felonious assault on Lawrence Williams. The officers had Williams' information, corroborated by an earlier police report, which included information gathered from another eyewitness. Further, the officers also observed the previously described pickup truck in the exact locations specified by Williams; *viz.,* the Longwood Estates parking lot and in front of Mr. B's Bar. They also observed the temporary tag in the rear window, the matching description of Thomas, and the suspicious actions of defendants when they became aware of the police as well as defendant Thomas' long delay in bringing his vehicle to a stop.

All of these factors provided Officers Mullins and Deli with grounds for a valid *Terry* stop of the pickup to ascertain Thomas' identity. Further, when Thomas identified himself as Albert Thomas, that fact, combined with all of the facts outlined above, provided Officer Mullins with probable cause for a lawful warrantless arrest of Albert Thomas for felonious assault.

■ Furthermore, based upon *Hensley,* the officers were also entitled to seize evidence in plain view during the valid *Terry* stop of the pickup. Thus, when Officer Mullins asked Thomas to step out of the pickup, he was entitled to seize the revolver when he saw its handle sticking out from under the driver's seat. Moreover, this also provided probable cause for Officers Mullins and Deli to arrest Thomas, the driver, and Dupree, who was sitting in the middle of the front seat of the pickup and could have readily accessed the gun, on charges of carrying a concealed weapon.

■ Further, once Officers Mullins and Deli had probable cause for a lawful warrantless arrest of Thomas, or Dupree for that matter, they then could make a valid search of the passenger compartment of the pickup. "[A] lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area." *New York v. Belton,* 453 U.S. 454, 457, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1981). "A police officer may search the passenger compartment of an automobile incident to the lawful custodial arrest of the occupant of the vehicle without a warrant or probable cause." *United States v. Mans,* 999 F.2d 966, 968 (6th Cir.1993). "This is so even if the arrestee has been separated from [the vehicle] prior to the search of the passenger compartment." *Id.* at 968–69.

■ Thus, the officers validly searched the passenger compartment of the pickup. Since Dupree's purse and the firebox were both sitting on the front seat of the pickup immediately following the lawful custodial arrests, both could be searched as part of a lawful search incident to an arrest.

■ In addition, both Dupree's purse and the firebox were also the proper subjects of an inventory search. Officer Mullins testified that Dupree's purse was searched at the scene for weapons but that the purse was inventoried at the station following her arrest. Likewise, he testified that the firebox was inventoried at the scene, pursuant to police procedure, prior to the towing of the vehicle to the police impound lot. The Supreme Court has found that inventory searches of automobiles as well as an inventory search of the personal effects of an arrestee at a police station were permissible under the Fourth Amendment. *Colorado v. Bertine,* 479 U.S. 367, 370, 107 S.Ct. 738, 740, 93 L.Ed.2d 739 (1987). *See also Michigan v. Thomas,* 458 U.S. 259, 261, 102 S.Ct. 3079, 3080–81, 73 L.Ed.2d 750 (1982) (per curiam) ("when police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of

the vehicle, even after it has been impounded and is in police custody.... [T]he justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood ... that the car would have been driven away, or that its contents ... tampered with," while the police obtained a warrant).

Accordingly, the district court did not err in denying defendants' motions to suppress. The stop of the pickup was a valid *Terry* stop, which was followed by the lawful custodial arrests of both defendants, arrests which were based upon probable cause. Moreover, the search of Dupree's purse and the firebox were valid both as searches incident to a lawful custodial arrest and as inventory searches.

### B.

■ Both defendants Thomas and Dupree argue that the district court's instruction on aiding and abetting were plain error. In this case, neither Thomas nor Dupree objected to the district court's instruction on aiding and abetting, and neither defendant proposed alternative instructions. Thomas asserts that defendants were not afforded the opportunity to object or to submit alternative instructions. However, the record refutes this contention. First, Dupree filed proposed instructions concerning the charges in count one of the indictment. Second, defendants were afforded an opportunity to object to the government's proposed instructions. Further, during the trial the district court distributed copies of its proposed jury instructions to counsel for their review. Later, during a luncheon recess, the district court discussed the proposed jury instructions with counsel prior to giving the proposed instructions to the jury. Both defense counsel questioned other portions of the district court's proposed instructions; however, neither defense counsel questioned the proposed aiding and abetting instruction.

Because defendants failed to object to the jury instructions, we review only for plain error. *United States v. Morrow,* 977 F.2d 222, 226 (6th Cir.1992) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993). Federal Rule of Criminal Procedure 52(b) is the applicable rule governing our review for plain error. Under Rule 52(b), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

In *United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), the Court recently set forth the relevant criteria in determining whether a Rule 52(b) remedy is appropriate. After initially noting that " '[n]o procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it,' " *id.* at ——, 113 S.Ct. at 1776 (quoting *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 677, 88 L.Ed. 834 (1944)), the Court stated that Rule 52(b) empowers Courts of Appeals to correct errors that were forfeited because they were not timely raised in the district court. The Court cautioned, however, that the Court of Appeals' power under Rule 52(b) is limited in three significant respects.

The first limitation is that an error must have occurred in the district court proceedings. The Court explained that a deviation from a legal rule constitutes an error within the meaning of Rule 52(b) so long as the rule has not been waived by the defendant. By way of example, the Court noted that "a defendant who knowingly and voluntarily pleads guilty in conformity with the requirements of Rule 11 cannot have his conviction vacated by the Court of Appeals on the grounds that he ought to have had a trial. Because the right to trial is waivable, and because the defendant who enters a valid guilty plea waives that right, his conviction without a trial is not 'error.' " *Id.* at ——, 113 S.Ct. at 1777. The Court made clear, however, that the mere failure of a defendant to make a timely assertion of a right does not constitute a waiver, but rather, constitutes a forfeiture and that in those circumstances an error under Rule 52(b) is not extinguished. Thus, the Court concluded, "[i]f a legal rule was violated during the District Court pro-

ceedings, and if the defendant did not waive the rule, then there has been an 'error' within the meaning of Rule 52(b) despite the absence of a timely objection." *Id.*

"The second limitation on appellate authority under Rule 52(b) is that the error be 'plain.'" *Id.* The term plain, the Court explained, "is synonymous with 'clear' or, equivalently, 'obvious.'" *Id.* Without expressing an opinion in the special case "where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified[,]" *id.,* the Court instructed that "[a]t a minimum, the Court of Appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law." *Id.*

The third limitation on appellate authority under Rule 52(b) "is that the plain error 'affec[t] substantial rights.'" *Id.* at —— ——, 113 S.Ct. at 1777–78 (alteration in original). As a general rule, the Court stated that the "affect substantial rights" phrase means "that the error must have been prejudicial: It must have affected the outcome of the District Court proceedings." *Id.* at ——, 113 S.Ct. at 1778. However, the Court refrained from deciding whether the phrase "'affecting substantial rights' is always synonymous with 'prejudicial.'" *Id.* Rather, it simply set forth that "[n]ormally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)." *Id.*

Having identified the three limitations of appellate authority under Rule 52(b), the Court then stated that the rule is permissive, not mandatory. Thus, as the Court explained, even if a forfeited error is plain and affects substantial rights, a Court of Appeals may decline to order a correction. In discussing the appropriate standard by which Courts of Appeals should base their decision on whether to exercise remedial discretion under Rule 52(b), the Court noted that in prior cases it had instructed that the discretion conferred by Rule 52(b) should be employed "'"in those circumstances in which a miscarriage of justice would otherwise result,"'" *id.* at ——, 113 S.Ct. at 1779 (quoting *United States v. Young,* 470 U.S. 1, 15,

105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982))), i.e., where the defendant is actually innocent. However, while the Court referred to the "miscarriage of justice standard," it remarked that it had never held a Rule 52(b) remedy was warranted only in cases of actual innocence. *Id.* According to the Court, the appropriate standard is that: "[t]he Court of Appeals should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)) (second alteration in original).

Thus, our inquiry under Rule 52(b) is made up of four distinct analyses. First, we are to consider whether an error occurred in the district court. Absent any error, our inquiry is at an end. However, if an error occurred, we then consider if the error was plain. If it is, then we proceed to inquire whether the plain error affects substantial rights. Finally, even if all three factors exist, we must then consider whether to exercise our discretionary power under Rule 52(b), or in other words, we must decide whether the plain error affecting substantial rights seriously affected the fairness, integrity or public reputation of judicial proceedings.

We conclude that no error occurred in the district court. The district court, in instructing the jury on possession, adopted the language proposed by Dupree and set forth in *United States v. Ascarrunz,* 838 F.2d 759, 763–64 (5th Cir.1988) (per curiam). The district court's instructions on specific intent as well as the meaning of "knowingly" were from 1 Devitt and Blackmar, *Federal Jury Practice and Instructions* §§ 14.03, 14.04 at 377–83 (1977). Further, the district court's instruction on aiding and abetting was from 1 Devitt and Blackmar, *Federal Jury Practice and Instructions* §§ 12.02–03, 14.04 at 325–29, 381–83 (1977). This court has previously upheld a conviction where the identical language was used by the trial court. *See United States v. Milby,* 400 F.2d 702, 706–07 (6th

Cir.1968). More precisely, this court has reviewed the identical language where the defendant also did not object to the aiding and abetting instruction and found that it did not constitute plain error. Further, the Seventh Circuit has recently upheld a very similar instruction, rejecting the defendant's argument that the instruction was error because it failed to adequately convey a specific intent requirement. *See United States v. Valencia,* 907 F.2d 671, 680–81 (7th Cir. 1990).

Finally, the case of *United States v. Bryant,* 461 F.2d 912 (6th Cir.1972), relied on by defendants, is distinguishable from this case. In *Bryant,* this court found that the district court's jury instruction on aiding and abetting was plain error because the court failed to instruct the jury on the element of intent. *Id.* at 921. In this case, the district court instructed the jury concerning intent, stating that "[i]n order to aid and abet another to commit a crime it is necessary that the accused willfully associate himself in some way with the criminal venture, and willfully participate in it as he would in something he wishes to bring about; that is to say, that he willfully seek by some act or omission of his to make the criminal venture succeed." J.A. 74. In *United States v. Armstrong,* 909 F.2d 1238, 1243–44 (9th Cir.), *cert. denied,* 498 U.S. 870, 111 S.Ct. 191, 112 L.Ed.2d 153 (1990), the Ninth Circuit reviewed jury instructions on aiding and abetting which included the identical language and found that the instructions were not plain error. Thus, having found no error, we need not consider the other factors under *Olano.*

### C.

■ Both defendants argue that the district court erred in determining that the amount of crack cocaine found in the firebox was over 50 grams. At sentencing, the government bears the burden of proving by a preponderance of the evidence the quantity of drugs chargeable to a defendant or defendants. *United States v. Sims,* 975 F.2d 1225, 1242 (6th Cir.1992), *cert. denied,* —— U.S. ——, —— and ——, 113 S.Ct. 1315, 1617 and 1620, 122 L.Ed.2d 702; 123 L.Ed.2d 177, 179 (1993). A district court's finding as to the amount of drugs involved will not be reversed on appeal unless clearly erroneous. *Id.* (citing *United States v. Walton,* 908 F.2d 1289 (6th Cir.), *cert. denied,* 498 U.S. 906, 989 *and* 990, 111 S.Ct. 273, 530 and 532, 112 L.Ed.2d 229, 541, 542 (1990)). "[T]he guidelines do not permit the District Court to hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible." *Walton,* 908 F.2d at 1302. An estimate will suffice if supported by a preponderance of the evidence; however, in reaching an estimate the district court must err on the side of caution. *Id.*

■ In this case, the district court's conclusion that the amount of crack cocaine seized from the firebox was in excess of 50 grams was not clearly erroneous. First, when Ms. Johnson–Whitt weighed the crack cocaine samples on March 9, 1992, the total weight of the crack cocaine was 53.6 grams. Ms. Johnson–Whitt testified that she personally weighed the crack cocaine and determined the weight to be 53.6 grams. Second, at sentencing, Ms. Denissoff testified that she was one of three other forensic chemists present at the City of Cleveland laboratory on March 9, 1992, that she personally witnessed Ms. Johnson–Whitt weigh the crack cocaine, and she agreed that the weight was 53.6 grams. There is no other evidence of record pertaining to the weight of the cocaine on March 9, 1992.

Defendants' independent expert did not reweigh the crack cocaine until September 1992, some six months after it was weighed by Ms. Johnson–Whitt. At that time, the independent expert determined that the total weight of the cocaine was 49.535 grams. Further, the sample was again reweighed three months later and there was further weight loss, ostensibly due to evaporation. Moreover, Ms. Johnson–Whitt testified that she used 16 samples of the crack cocaine for her testing procedures and that the 16 samples were destroyed as part of the testing process. Ms. Johnson–Whitt did not weigh the samples which she used; however, she estimated that she used .10 gram per test or

1.6 grams total during the testing. Ms. Johnson–Whitt's estimate that she used .10 gram per test is based upon the fact that she performed more than 1,000 such tests while at the forensic laboratory. Ms. Johnson–Whitt also testified that it was possible to perform the tests with as little as 1/20th or .05 gram, which would mean that it was possible that she could have performed the tests using only 0.8 gram for the testing. However, if either 1.6 grams or 0.8 gram is added to the weight determined by the independent expert in September 18, 1992, the weight is still in excess of 50 grams.

### III.

For the reasons stated, the district court's judgments and the resulting sentences are AFFIRMED.