UNITED STATES of America,
Plaintiff–Appellee,

v.

Bartholomew COOPER, Defendant–
Appellant.

No. 99–5633.

United States Court of Appeals,
Sixth Circuit.

Jan. 10, 2001.

Before NELSON and MOORE, Circuit Judges; WILHOIT, District Judge.[*]

## OPINION

WILHOIT, District Judge.

The United States appeals the district court's suppression of the Defendant's statements as fruits of an unlawful detention. Because we find the Defendant was under lawful arrest at the time he allegedly incriminated himself, we REVERSE the district court.

### I.

On July 28, 1998, Sandra Cooper, wife of the Defendant–Appellee, Bartholomew Cooper, brought what appeared to be a silencer for a firearm to the Memphis office of the Federal Bureau of Investigation. The FBI referred her on to the Bureau of Alcohol, Tobacco and Firearms. Mrs. Cooper told the ATF agents that she found the silencer the day before hidden in the home she shared with the Defendant; that she and the Defendant were experiencing marital difficulties; that they had a violent altercation the night before wherein the Defendant threatened her; and that she had fled her home in fear for her life. Expressing concern for her safety, Mrs. Cooper stated that the Defendant kept three rifle-type guns in the home and she told the officers where they could find

[*] The Honorable Henry R. Wilhoit, Jr., Chief Judge of the United States District Court for the Eastern District of Kentucky, sitting by designation.

them. Mrs. Cooper further stated that she owned two pistols, herself, but that one of them was missing. She expressed her suspicions that her husband had this missing gun as he "sometimes carried a gun in his truck". Finally, Mrs. Cooper advised the officers that her husband had recently confronted local law enforcement officers with a gun when they came to their home on a domestic dispute call.

The agents checked the Defendant's criminal record and discovered that he was a convicted felon. They also checked Mrs. Cooper's identification to verify her name and address. They questioned Mrs. Cooper for several hours and then obtained her permission to search the home.

The agents devised a scheme to get the Defendant away from his home while they searched it. Specifically, they decided to have Mrs. Cooper coax him away from the home and then have local law enforcement stop him, detain him, obtain his consent, and search his vehicle. According to ATF Agent Walter Hoback ("Hoback"), the primary purpose for stopping and detaining the Defendant was not to search for contraband but to protect those officers searching the home from a violent confrontation while they verified the wife's information. Hoback was clear that he would not have let his agents search the Cooper home until the Defendant was successfully detained.

Pursuant to the agents' instructions, Mrs. Cooper called the Defendant at home, told him her car was being serviced, and asked him to pick her up. The Defendant agreed and left his home in his BMW car, not his truck. Local law enforcement officers then stopped and detained the Defen-

dant a few blocks from his home pursuant to Hoback's instructions.

The stop occurred at approximately 3:21 p.m. The detaining officers did not tell the Defendant why they had pulled him over despite his repeated questions to that effect. Instead, they asked for and obtained the Defendant's drivers licence. They then asked him to exit his vehicle, handcuffed him, and placed him in the back of a patrol car. With the Defendant's consent, they searched his vehicle and brought in a drug dog to sniff it. No weapons or drugs were found.

ATF agents led by Agent Hoback and accompanied by Sandra Cooper proceeded to search the Cooper home once the Defendant was stopped. They found the first firearm behind the guest house door where Mrs. Cooper told them it would be. The agents found two more firearms and some ammunition in a pull-down attic. The agents also searched the Defendant's truck which was parked in the garage but did not find Mrs. Cooper's missing gun.

After discovering the three weapons, the ATF agents radioed the unformed officers detaining the Defendant to arrest him and bring him to the house. The Defendant arrived at his house in the patrol car around 3:40 p.m. The officers then moved him to the back of an unmarked police car in response to his complaints about the heat. Shortly thereafter, Officer Herbert Adair entered the front of the vehicle to question the Defendant.

Officer Adair initially asked the Defendant a few questions about his criminal background. He read the Defendant his Miranda rights from a card after the Defendant began to talk about the guns. At that point, the Defendant stated that he "did not want to make a statement."[1]

---

1. There is some dispute as to what the Defendant's exact words were. Officer Adair testified that the defendant said he "did not want

to talk to them". Agent Hobart, on the other hand, testified that the Defendant said he "did not want to make a statement." The Magis-

Adair understood from this that the Defendant did not want to talk and informed Hoback that the Defendant was not inclined to talk. Hoback understood from Adair that the Defendant was "kind of negative" about talking and entered the car himself for the explicit purpose of getting a statement. He testified that he considered the Defendant's prior response that he did not want to make a statement ambiguous as he was not sure whether the Defendant meant a written statement, taped statement or any statement. He therefore sought clarification by asking the Defendant whether he meant that he would not answer questions. When the Defendant responded that he would answer questions, Hoback explained that doing so would be the same thing as making a statement. The Defendant then replied that he would make a statement and the officers resumed their questioning. The questioning continued in the car for 20–30 minutes and then was moved into the house. During the questioning, the Defendant admitted that he purchased two of the firearms at a gun show and that the other had been given to him by a family member.

On August 24, 1998, a federal grand jury indicted the Defendant on two counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). In November 1998, Defendant Cooper moved to suppress his statements to Agent Hoback in addition to other evidence not pertinent to this appeal. The district court referred the motion to a magistrate judge. The magistrate judge conducted a hearing on the matter and subsequently issued a report and recommendation that the Defendant's statements be suppressed. Though the magistrate judge found the statements

voluntary, she nevertheless concluded that they were the fruit of an unlawful detention. The magistrate judge reasoned that law enforcement stopped and detained the Defendant without probable cause to support an arrest and without the requisite suspicion of criminal activity to support an investigatory detention. The district court adopted these findings as and for its own opinion over the Government's objections. It is from that decision that the Government appeals.

## II.

■■ The Fourth Amendment protects citizens from the unreasonable seizure of their persons. *Dunaway v. New York*, 442 U.S. 200, 207, 99 S.Ct. 2248, 2253, 60 L.Ed.2d 824 (1979). This Amendment is implicated any time an officer restricts an individual's freedom to leave. *Id.* 442 U.S. at 207 n. 6. Stopping a vehicle and detaining its occupant therefore constitutes a seizure for Fourth Amendment purposes regardless of the scope or brevity of the detention. *United States v. Hill*, 195 F.3d 258, 263 (6th Cir.1999). The burden of proving the constitutional validity of such a seizure falls squarely on the Government. *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1295 (9th Cir.1988). Unless the Government can constitutionally justify a detention, the courts will suppress any statements obtained directly therefrom. *United States v. Edwards*, 885 F.2d 377, 384 (7th Cir.1989).

■■ In this case, the magistrate judge found and the district court agreed that the Defendant's roadside detention violated the Defendant's Fourth Amendment rights. The district court suppressed the Defendant's subsequent statements to the

---

trate Judge and District Court apparently found Hobart's account to be more accurate as they state in their fact findings that the

Defendant told them he did not want to make a statement. This Court cannot say that those findings are clearly erroneous.

police as fruits of his unconstitutional detention. In reviewing the suppression decision, we look only for clear error in the district court's factual findings. *United States v. Smith,* 182 F.3d 473, 476 (6th Cir.1999). We review de novo the district court's legal conclusions and its application of law to the facts as with its probable cause determination. *United States v. Thomas,* 11 F.3d 620, 627 (6th Cir.1993); *United States v. Navarro,* 90 F.3d 1245, 1251 (7th Cir.1996).

The District Court determined that the Defendant was arrested rather than detained when local law enforcement stopped his vehicle. For the Defendant's warrantless arrest to be valid, the Government must demonstrate that it was supported by probable cause. *Allen v. City of Portland,* 73 F.3d 232, 236 (9th Cir.1995); *Thomas,* 11 F.3d at 627. Probable cause exists when officers possess reasonably trustworthy information sufficient to warrant a reasonable person to believe that the accused had committed or was committing a crime. *Thomas,* 11 F.3d at 627. The officers need not make an actual prima facie showing of criminal activity but simply demonstrate a probable chance thereof. *United States v. Hodges,* 705 F.2d 106 (4th Cir.1983). This requires something less than proof sufficient to support a conviction but something more than bare suspicion. *Thomas,* 11 F.3d at 627.

The United States insists that it had probable cause to arrest the Defendant for being a felon in possession of a firearm when it first stopped him. It bases this argument on (1) the verification that the Defendant was a convicted felon; (2) information from the Defendant's wife that he owned three weapons and sometimes carried her gun in his truck; and (3) the wife's production of a silencer. The magistrate judge and district court rejected this argument as an "eleventh-hour" assertion

undermined by the officers' own actions. As noted by the district court, the record amply demonstrates that the uniformed officers conducting the traffic stop and the officers conducting the search may not have subjectively felt probable cause existed before the guns were located.

The district court placed too much emphasis on the officers' inferred subjective beliefs. Probable cause is measured by an objective standard. *Warren v. City of Lincoln,* 864 F.2d 1436 (8th Cir.1989); *United States v. Salinas–Calderon,* 728 F.2d 1298, 1300–01 (10th Cir. 1984). The test is not whether the arresting officers themselves believed they had probable cause to act but whether any prudent, trained officer could justifiably believe an offense had been committed. *Salinas–Calderon,* 728 F.2d at 1300–01. Thus, the arresting officer's subjective opinion is immaterial and will not foreclose the Government from subsequently justifying a detention with claims of probable cause. *Id.* at 1301; *Warren,* 864 F.2d at 1439. If probable cause is later determined to have existed, the arrest will be deemed constitutionally valid even if the officers proceeded under an investigative stop rationale at the actual time of arrest. *Warren,* 864 F.2d at 1440.

An informant's tip, by itself, can suffice to create probable cause if the tip appears reliable under the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). The fact that Mrs. Cooper made her identity known to the officers lends credence to her statement. *See United States v. Elliott,* 893 F.2d 220, 223 (9th Cir.1990), *amended on other grounds,* 904 F.2d 25 (9th Cir.1990), *cert. denied,* 498 U.S. 904, 111 S.Ct. 268, 112 L.Ed.2d 224 (1990) (informant's willingness to be named is indicia of reliability and veracity.) Though she did not give her

statement under oath or before a magistrate, the law does not require as much. *Id.* Furthermore, Mrs. Cooper lived with the Defendant continuously until the night before she turned him in. She provided a detailed account of her husband's alleged criminal activity based on her direct observations and first-hand knowledge thereof. As this Court has previously recognized, "there could hardly be more substantial evidence of the existence of the material sought and its relevance to a crime than [the informant's] direct viewing of the [evidence] in [the suspect's] house." *United States v. Pelham,* 801 F.2d 875, 878 (6th Cir.1986). Furthermore, Mrs. Cooper stated explicitly that the Defendant owned three rifle-type guns that he kept in the house, that at least one gun could be found behind the front door of her guest house, and that the Defendant sometimes kept her handgun in his truck. Mrs. Cooper's detailed description of the nature and location of the guns only lends further credence to her story. *Elliott,* 893 F.2d at 223. More importantly, Mrs. Cooper brought her claim to not one but two federal agencies; provided not only her name but proof of her identity; and demonstrated her willingness to actively cooperate in the agency's further investigatory plans by consenting to a search, participating in a plan to lure her husband from her home, and accompanying the officers on the search. She bolstered her claim that firearms could be found by providing the police with a firearms accessory that she discovered just the day before. These facts, objectively, provide sufficient information for a reasonable officer to conclude that there was a substantial probability of criminal activity.

We are mindful, of course, that Mrs. Cooper had motive to lie as she was an angry wife who had just decided to end her rocky marriage. This possible motivation, by itself, does not necessarily render her statement unreliable, though. *United States v. Phillips,* 727 F.2d 392, 297 (5th Cir.1984). Because Mrs. Cooper provided an explicit, detailed description of her husband's alleged criminal activity based on her own first-hand observations, her tip was automatically entitled to greater weight despite any doubts the officers may have had as to her motivations. *Gates,* 462 U.S. at 234; *see also United States v. Hodges,* 705 F.2d 106, 108 (4th Cir.1983) (refusing to reject probable cause determination based on detailed statement of former live-in girlfriend despite possibility that informant bore the defendant ill will.) Indeed, detailed tips can and have been deemed sufficiently reliable in the past despite an informant's expressed, negative motivations. *See Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (upholding search warrant based on ex-girlfriend's detailed tip of criminal activity which she observed first-hand despite her attempt to proceed anonymously, her recent break-up with the defendant, and her admitted desire to "to burn him"); *& United States v. Copeland,* 538 F.2d 639 (5th Cir.1976) (Probable cause for search warrant based on ex-father-in-law's statement upheld despite informant's admission that he had "an axe to grind" with the defendant where information was based on informant's first-hand observations and informant's reputation for truthfulness was known to law enforcement.) There was no explicit expression of ill will on Mrs. Cooper's behalf.

The present case is factually analogous to *United States v. Phillips,* 727 F.2d 392 (5th Cir.1984), though that case involved an attack on a search warrant rather than a warrantless arrest. In Phillips, the defendant's wife went to the ATF when her rocky marriage had deteriorated to the point that she was forced to flee her home after being threatened with violence. The

wife informed the ATF that her husband, a convicted felon, possessed an unregistered, sawed-off shotgun. *Id.* at 393–94. The wife was explicit as to when her husband received the gun and where he kept it in the home. *Id.* ATF agents did not know the wife and could not vouch for her reliability. *Id.* at 394. Nor did they do anything to corroborate her story before seeking a search warrant other than to verify that the defendant had not registered his gun. *Id.*

When the gun was subsequently recovered and the husband was arrested, the wife changed her story. *Id.* She told the agents that she had lied before and then planted the gun just to get her husband in trouble. *Id.* The defendant then moved to suppress the gun by claiming that probable cause for the search warrant could not exist based on the wife's unreliable information. *Id.* The husband, like the present Defendant, stressed that the agents had no prior information that the wife was reliable and had not corroborated her claim. *Id.* at 395. Furthermore, the husband claimed the wife lacked credibility as she had just left home and was acting with a vengeful motive. *Id.*

The fifth circuit ultimately upheld the finding of probable cause. The court observed the possibility that the wife had acted out of either fear for her life or hostility towards her husband. *Id.* at 397. Nevertheless, any question as to her motives was overcome by the detail she provided. *Id.* The fact that the wife had given her statement under oath only tipped the scale further in the government's favor. *Id.* The court then summed up its findings as follows:

> In Gates, the [Supreme] Court stated that uncertainty regarding the infor-

mant's veracity could be compensated for by a "strong showing" of basis of knowledge. We believe that such a "strong showing" has been made in this case. [The informant] described in explicit detail where her husband lived, where the gun could be found, and she claimed that she had seen the defendant in possession of the illegal firearm. It does not appear that a stronger showing as to "basis of knowledge" could have been made. And while it may have been desirable to have greater indica of veracity than that of a sworn statement, [the informant's] story was not devoid of veracity as would have been the case had there been an anonymous tip. Thus, we conclude that in light of the "totality of the circumstances," there was a "fair probability" that [the informant's] tip was true.

*Id.* at 399.

Though Mrs. Phillips, unlike Mrs. Cooper, provided her statement under oath, the officers in the instant action did at least go so far as to check Mrs. Cooper's identification and Mr. Cooper's criminal record, something the officers failed to do in the Phillips case. *Id.* Thus, they had at least corroborated that Mrs. Cooper was the Defendant's wife, that she shared his address, and that the Defendant was a convicted felon. The fifth circuit noted that these simple steps, by themselves, would have produced even "greater indication" of reliability. *Id.* Thus, in certain respects, the case *sub judice* is even stronger than Phillips[2].

The Defendant is quick to point out, of course, and rightly so, that all of the cited cases upholding probable cause based on informants with negative motivations in-

---

**2.** It is interesting to note that the fifth circuit indicated that it would have been equally acceptable in that case to search with the wife's consent as opposed to obtaining a search warrant.

volve challenges to search warrants where probable cause was found to exist by a neutral and detached magistrate. In such cases, the magistrate's probable cause determinations are afforded great deference. *United States v. Melancon*, 462 F.2d 82, 89–90 (5th Cir.1972). There was no warrant in the instant action and the facts were never presented to a magistrate. Had the ATF agents requested a warrant in this case, they most certainly should have told the magistrate the facts reflecting the motivation problem. *Phillips*, 727 F.2d at 399–400. Nevertheless, the ultimate test for probable cause remains the same. It seems unreasonable to reject Mrs. Cooper's statement based only on her possible, unexpressed motivations for acting when, under established law, the indicia of hostility is not plainly material to the determination of probable cause. *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1127 (9th Cir.1997). Applying an objective test, then, we find that probable cause did exist for the Defendant's arrest at the time he was first stopped.

## II. Voluntariness.

■■■ The issue remains whether Agent Hoback violated the Defendant's right to remain silent when he continued to question the Defendant after he indicated that he did not want to make a statement. The Defendant's relinquishment of his right to remain silent will only be upheld as voluntary if, " 'the totality of the circumstances surrounding the investigation' reveal both" his "uncoerced choice" to speak and his understanding of what he was giving up. *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir.2000). In this case, the Defendant indicated that he did not want to make a statement. Lieutenant Adair understood that the Defendant did not want to talk to them but Hoback was not sure what the Defendant specifically wanted. He understood that the Defendant was generally negative and did not intend to blurt things out. Nevertheless, he was not sure whether the Defendant meant a written statement, oral statement, or any statement. Hoback simply wanted to clear this up.

■■■ The Supreme Court has held that questioning must cease when there is an unequivocal and unambiguous invocation of one's right to counsel. *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The rules governing the right to counsel apply equally to the invocation of one's right to remain silent. *Bui v. DiPaolo*, 170 F.3d 232, 239 (1st Cir.1999). When the invocation is ambiguous, questioning need not cease entirely. The Defendant's invocation in this case was ambiguous and Hoback's subsequent questioning was properly limited to clarifying the Defendant's intent. Therefore, we find that the officers did not overstep Miranda and that the Defendant's alleged statements were voluntary.

## III. Conclusion.

Because we find that the Defendant voluntarily gave his statements while under lawful arrest, we REVERSE the district court's decision to suppress the same and REMAND this matter to the District Court for further proceedings consistent with this opinion.

MOORE, Circuit Judge, dissenting.

The majority opinion overlooks the government's total failure to establish probable cause to arrest when the defendant was initially stopped in his car. Even if the government had reasonable suspicion for an investigative *Terry* stop, this stop ripened into an arrest for which the government lacked probable cause. The district court therefore properly concluded that the defendant's statements must be suppressed as fruits of an illegal arrest.

For reasons set forth below, I must respectfully dissent.

## I. Fruit of the Poisonous Tree Doctrine

Under the fruit of the poisonous tree doctrine, the court must consider whether derivative evidence, in this case the incriminating statements by the defendant regarding ownership of the guns seized at his home, "has been come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (quoting MAGUIRE, EVIDENCE OF GUILT, 221 (1959)). This doctrine serves two purposes, "deterring lawless conduct by federal officers" and "closing the doors of the federal courts to any use of evidence unconstitutionally obtained." *Brown v. Illinois*, 422 U.S. 590, 599, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (quoting *Wong Sun*, 371 U.S. at 486) (internal quotations omitted). Whether the taint of an illegality has been sufficiently dissipated depends on whether the incriminating statements at issue in this case "w[ere] sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun*, 371 U.S. at 486.

The government's illegal arrest of the defendant tainted the admissibility of the defendant's incriminating statements which he subsequently made. Specifically, the government has failed to demonstrate that it either had probable cause to arrest at the time the defendant was stopped in his car, or that it acted within the bounds of a legal *Terry* investigatory stop. Therefore, the district court properly concluded that the defendant's statements must be suppressed as fruits of the government's illegal arrest, even though the defendant received a *Miranda* warning prior to making these statements.

## II. Probable Cause to Arrest

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. The government may, however, arrest or seize a person without a warrant when the arrest is supported by probable cause. *See United States v. Strickland*, 144 F.3d 412, 415 (6th Cir.1998). Our circuit applies a stricter standard of review for warrantless searches than it does for warrants issued by an impartial magistrate judge. *See United States v. Carriger*, 541 F.2d 545, 553 (6th Cir.1976). The government bears the burden to establish the legitimacy of its warrantless search. *See United States v. Akrawi*, 920 F.2d 418, 421 (6th Cir. 1990). To determine whether probable cause to arrest exists, a reviewing court must undertake a "totality-of-the-circumstances approach." *United States v. Pelham*, 801 F.2d 875, 877 (6th Cir.1986), *cert. denied* 479 U.S. 1092, 107 S.Ct. 1305, 94 L.Ed.2d 160 (1987) (citing *Illinois v. Gates*, 462 U.S. 213, 230–31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

While the government claims that Mrs. Cooper was a credible source whose detailed statements based on first-hand knowledge were sufficient to give rise to probable cause, Agent Hoback's own testimony undermines this assertion. Agent Hoback testified, "If there were guns in her house, that would mean that she was telling at least the truth about guns being in her house ... I was going to the house to see if [Mrs. Cooper] was telling the truth." Joint Appendix ("J.A.") at 135–36. Agent Hoback explained that he wanted the defendant "detained until [he] could get in the house and look to see whether

there was evidence to support what [Mrs. Cooper] was telling us was going on." J.A. at 142.

Thus, Agent Hoback's own statements demonstrate that there could not have been probable cause for arrest at the time the defendant was stopped in his car because the agents had not yet confirmed whether or not the defendant in fact possessed guns in his home as his wife had stated. Aware of Mrs. Cooper's motive to fabricate her statements given her volatile marital relations with the defendant. Agent Hoback doubted Mrs. Cooper's credibility. Lieutenant Adair also admitted that he did nothing to corroborate Mrs. Cooper's statements as to whether or not the guns she claimed that the defendant possessed were actually located in the Coopers' residence.

In view of the totality of the circumstances, the officers lacked probable cause to arrest the defendant at the time he was stopped in his car absent further corroboration as to the existence of the guns in the defendant's house. Corroboration of Mrs. Cooper's statements regarding guns at the house occurred only after the defendant was stopped, detained, and placed in the back of a police car. Furthermore, the officers stopped the defendant who was driving his BMW sedan, even though Mrs. Cooper explicitly stated that her husband "sometimes kept a gun in his truck," but had not suggested he kept a gun in the BMW. Indeed, a search of the defendant's BMW revealed no guns or drugs. Based on the totality of circumstances, the police impermissibly arrested the defendant without having the requisite probable cause.

### III. *Terry* Investigative Stop

If viewed as a *Terry* stop, the government's actions exceeded the scope of a permissible investigative stop. The Fourth Amendment protects against unreasonable searches and seizures. *See United States v. Obasa*, 15 F.3d 603, 606 (6th Cir.1994). "A 'seizure' occurs when police detain an individual under circumstances where a reasonable person would feel that he or she is not at liberty to leave." *Id.* A *Terry* investigatory stop is a narrowly drawn exception to the requirement of probable cause under the Fourth Amendment and must be supported by reasonable suspicion of criminal activity. *See United States v. Richardson*, 949 F.2d 851, 856 (6th Cir.1991). This circuit has held that "reasonable suspicion can be based on a totality of circumstances no one of which standing alone would create a reasonable suspicion." *United States v. Anderson*, 923 F.2d 450, 455 (6th Cir.), *cert. denied*, 499 U.S. 980, 111 S.Ct. 1633, 113 L.Ed.2d 729 (1991).

The scope of law enforcement activities in an investigative stop depends upon the circumstances that originally justified the stop. *See Obasa*, 15 F.3d at 607. Consequently, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

"When a detention rises to the level of a full-fledged arrest, however, the Fourth Amendment demands that the seizure be supported by probable cause." *Gardenhire v. Schubert*, 205 F.3d 303, 313 (6th Cir.2000) (citing *Dunaway v. New York*, 442 U.S. 200, 212–14, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). We have recognized that an investigative stop may ripen into an arrest when there is "any 'clear depri-

vation of liberty caused by law enforcement officials,'" even if there are no formal words of arrest. *United States v. Hatfield,* 815 F.2d 1068, 1071 (6th Cir. 1987) (quoting *United States v. Canales,* 572 F.2d 1182, 1187 (6th Cir.1978)). An investigatory stop that exceeds the bounds of *Terry* constitutes an arrest that can be justified only upon a showing of probable cause. *Gardenhire,* 205 F.3d at 312; *Richardson,* 949 F.2d at 858.

In a case involving similar facts to this case, a panel of this court reversed the district court's order denying the defendant's motion to suppress evidence, because the police unreasonably seized the defendant by moving the defendant into the police car for questioning and then taking her to the police station where she was detained further and subjected to more questioning. *See United States v. Butler,* 223 F.3d 368, 375 (6th Cir.2000). The court noted that once the defendant answered the police's questions and consented to a patdown which revealed nothing suspicious, the police were required under the Fourth Amendment to release the defendant. *Id.* The court concluded that "[t]he officer's continued detention of the defendant in the back of a locked patrol car ripened the investigatory stop into an arrest" which constituted an illegal seizure of the defendant because the officers lacked probable cause for arrest. *Id.*

As in *Butler,* the defendant in this case was detained in the back of a police car where he was questioned by officers, after a search of the defendant's vehicle revealed nothing suspicious. Similarly, the investigatory stop here ripened into an arrest when the defendant was detained, handcuffed, placed in a police car, and transported from the scene of the stop to another location. Parallel to *Butler,* having found no guns or drugs in the defendant's car, the officer was required to re-

lease the defendant unless he had probable cause for arrest. This circuit has held that the police exceed the bounds of *Terry* by placing the defendant in the back of a police vehicle. Such actions not only constitute a seizure, "but also cross[] the line into an arrest." *Richardson,* 949 F.2d at 857. Thus, the defendant was effectively arrested when the officer placed him in the backseat of the police car.

After the investigatory stop ripened into an arrest, the government was obligated either to establish probable cause to support the arrest or to release the defendant. Although the officer formally arrested the defendant after receiving information that guns had been recovered at the defendant's residence, defendant Cooper was already under arrest for purposes of the Fourth Amendment once he was removed from his vehicle, handcuffed, and put in the back of the police car after the officer's search of the defendant's vehicle produced no firearms or other contraband. Therefore, in the absence of probable cause required for arrest, the government exceeded the scope of a legal *Terry* stop. Because the government failed to show that the taint of its illegal arrest was purged at the time the defendant made his incriminating statements, the defendant's statements constituted fruits of an illegal arrest which must therefore be suppressed. *See Wong Sun,* 371 U.S. at 487–88.

## IV. Voluntariness

In *Michigan v. Mosley,* the Supreme Court held that the "admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored." *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (internal quotations omitted). I am not persuaded

that the government demonstrated that it "scrupulously honored" the defendant's right to remain silent when, after the defendant stated that he did not want to make a statement, the officer continued to speak with the defendant in the guise of "clarification." Just as the police are required to stop all questioning when a suspect invokes his right to counsel, *see Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the police must similarly cease questioning when a suspect, as in this case, states that he does not want to make a statement. *See, e.g., United States v. Ramirez*, 79 F.3d 298, 304–05 (2d Cir.), *cert. denied*, 519 U.S. 850, 117 S.Ct. 140, 136 L.Ed.2d 87 (1996) (applying the rationale of *Davis* to the right to remain silent and stating that "once a suspect has unequivocally invoked his right to remain silent whether in the form of refusing to answer questions or asking that an ongoing interrogation be terminated, his request must be scrupulously honored") (internal citations omitted).

For the foregoing reasons. I respectfully dissent.