NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0506n.06
Filed: July 20, 2006

**No. 04-3894**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

    **Plaintiff-Appellee,**

v.

DONALD JACKSON,

    **Defendant-Appellant.**

                               /

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO**

**BEFORE:**    **KEITH, SUHRHEINRICH AND CLAY, Circuit Judges.**

**CLAY, Circuit Judge.** Defendant, Donald Jackson, was convicted in the United States District Court for the Southern District of Ohio of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), following an investigative stop by the Cincinnati police on April 4, 2003, in which drugs and a firearm were recovered from Defendant's vehicle. Defendant appeals the district court order denying his motion to suppress evidence seized during the investigative stop, alleging that the stop was unlawful and a violation of his rights under the Fourth Amendment. For the reasons set forth below, we **REVERSE** the district court and **VACATE** Defendant's conviction and sentence.

I.

Several members of the Cincinnati Police Division Street Corner Unit were involved in a "buy bust" operation, in which undercover officers had arranged to buy drugs from a drug trafficking suspect near the Beekman Street area in Cincinnati, Ohio. A suspect wanted for drug trafficking was identified at the scene of the "buy bust," but fled on a bicycle. A broadcast went out over the police radio at approximately 6:30 p.m. advising officers in the area that the police were in pursuit of the suspect, and numerous patrols in the area became involved in the search. The description broadcast over the radio was of a black male in his 30's, bald, wearing a long-sleeved gray or white t-shirt, and black or blue jeans.

One of the officers involved in the search, Officer Kim Lohman ("Lohman"), testified that she heard the police radio broadcast that there was a foot pursuit of a suspect last seen in the area of Westwood and Selim Streets, possibly headed toward Esmonde Street, so she proceeded to the area in her patrol car and exited her vehicle on Esmonde Street. Lohman and Officer Plumber ("Plumber"), another officer on the scene, began a foot search along the edge of the woods, looking for the suspect. Shortly after 6:30 p.m., Lohman said that she saw a green vehicle traveling westbound on Esmonde Street toward Quebec Road, being driven by a man who fit the description of the suspect. Lohman asked Plumber if that person looked like the suspect who was described over the radio, and he responded, "yes."

At 6:35:40, Plumber broadcast over the police radio that "there was a subject that just drove past about 1760 Esmonde, male, black, *bald* with a *gray* shirt on, looks like a BMW, green color, should be heading toward Quebec." (emphasis added). The dispatcher then asked for clarification, "He's in a gray BMW?" Officer Plumber corrected her, stating "green." At 6:36:05, the dispatcher

2

broadcast the following, "Suspect matching the description last seen in a green BMW . . . ." The dispatcher then asked the officers to clarify the direction of travel, and Lohman repeated that it was toward Quebec.

At 6:36:30, a broadcast came over the radio that officers on Esmonde "had the car stopped" at 1743 Esmonde. According to Lohman, she walked back to her car and looked to where the other officers had the car stopped and realized that it was the wrong vehicle "because it was headed Eastbound." At 6:36:50, Lohman radioed that "the car they have isn't the one that [they were] talking about." The dispatcher asked Lohman to "say that again," and Lohman responded at 6:37:05, that "the car they have down there is not the same one that we saw the male, black, with the gray shirt on . . . ." At 6:36:10, the dispatcher repeated that "the car they have is not the one that the possible suspect was last seen in; last seen in a green BMW," and Lohman interjected that "he was headed toward Quebec, not Grand." The dispatcher repeated, "last seen toward Quebec, not Grand."

Officers Rogers ("Rogers") and Stormes ("Stormes"), the two officers who stopped Defendant's vehicle, were in the area that day, in their police cruiser, working in conjunction with the drug unit on the "buy bust" operation. According to Rogers and Stormes, they heard the police radio broadcast about the pursuit of the suspect from the "buy bust" scene, describing the suspect as "a male, black, bald, gray long-sleeve t-shirt and jeans." (J.A. at 42.) Stormes and Rogers proceeded to Esmonde Street to assist in the search. Once they arrived at Esmonde Street, the officers "got out of their police cruisers and started walking towards the other officers" who were on Esmonde Street. (J.A. at 44.) Shortly thereafter, Stormes and Rogers heard the description

about the green BMW traveling on Esmonde toward Quebec. Within a minute of hearing the broadcast, Stormes and Rogers stopped Defendant's green Dodge Neon that was traveling the speed limit, Eastbound on Esmonde toward Grand. Stormes and Rogers testified that they stopped the vehicle because "it was the only green vehicle on Esmonde at the time." (J.A. at 58.)

Rogers stepped out onto the street where he could be seen by the driver, and motioned for him to stop. According to Rogers, Defendant "revved" his engine, and Rogers drew his weapon before approaching the car. Rogers walked up to within two feet of the car, where he saw that Defendant, a black male, with hair, wearing a short-sleeved black t-shirt was the sole occupant. Defendant had a "brown paper bag in his lap." Rogers asked Defendant, "what was in the bag" and Defendant responded that "he didn't know," and "immediately asked why he was being stopped." (J.A. at 51.) Rogers again inquired about the brown paper bag, and Defendant responded that "someone was running and threw the bag in the window of the car." (J.A. at 52.) At this point Defendant was ordered to exit the car.

Rogers took possession of the bag and placed it on top of the car. Rogers testified that as he was taking the bag from Defendant, small pieces of marijuana fell off the bag. Another officer then took custody of the bag, and opened it up. The bag contained cocaine, heroin, and methamphetamine. A lab report indicates that no marijuana was found inside the bag, nor was any taken from the car or Defendant's person.[1] Rogers testified that he was not informed that Defendant

---

[1] Stormes offered a contradictory account of the sequence of events. Stormes testified that he and Rogers stepped up to the window of the car and "Officer Rogers asked Mr. Jackson to step out of the vehicle. He noticed a brown paper bag that was in the lap of Mr. Jackson. Officer Rogers then took that and set it on top of the vehicle." (J.A. at 86.) Stormes said that after Defendant was out of the car, he and Rogers explained to him why he was being stopped, and stated that he matched

was not the suspect identified by the radio dispatch until after the bag was in police custody. Further search of the vehicle yielded a loaded 9 mm Glock semi-automatic pistol and $700 cash, among other items.

Defendant was charged on August 20, 2003 in a five-count indictment with violations of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and 21 U.S.C. § 844. On December 2, 2003, Defendant's attorney filed a motion to suppress requesting, *inter alia*, that all evidence seized from Defendant after he was stopped and searched by the Cincinnati police be suppressed. The district court held an evidentiary hearing on December 19, 2003, where several of the officers who were on the scene testified. On December 24, 2003, the district court issued an order denying the motion to suppress, finding that Rogers "had a reasonable suspicion of criminal activity on the part of the occupant of the green Neon which justified him in stopping defendant's car." (J.A. at 123.) The district court also found Rogers' testimony to be credible.

Counts 2-5 of the Indictment, charging Defendant with unlawfully possessing various controlled substances in violation of 18 U.S.C. § 844, were dismissed pursuant to a motion by the government. Defendant conditionally pled guilty to being a felon in possession of a firearm as charged in Count 1 of the Indictment, preserving his right to appeal the legality of the stop.

---

the description of a suspect that possibly was involved in a drug trafficking offense. In response to a question about what Defendant said in response, Stormes testified that he did not recall Defendant "saying much." Stormes said that at that point, Rogers had the brown paper bag, and said, "What's this?" Defendant replied, "I don't know." (J.A. at 87.) Defendant was then taken to the police vehicle, and the bag was taken into custody by the sergeant. Stormes made no mention of Defendant's remark about someone throwing the bag into his car, nor did he mention any marijuana pieces falling from the bag.

Defendant was sentenced on June 25, 2004, to 46 months imprisonment to be followed by 3 years supervised release.

Defendant filed this timely notice of appeal on July 1, 2004.

II.

This Court reviews the factual findings of a district court in a suppression hearing for clear error, and reviews its conclusions of law, such as the existence or absence of probable cause, *de novo*. *United States v. Couch*, 367 F.3d 557, 560 (6th Cir. 2004). A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on consideration of the entire evidence is left with a definite and firm conviction that a mistake has been committed. *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (1999) (citing *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir. 1993)). The determination by the district courts as to whether the facts establish an unconstitutional seizure under the Fourth Amendment is a question of law that this Court reviews *de novo*. *United States v. Avery*, 137 F.3d 343, 348 (6th Cir. 1997); *see also, Ornelas v. United States*, 517 U.S. 690, 698-99 (1996).

III.

We do not believe that the evidence in the record supports a finding justifying the stop of Defendant's vehicle that there was reasonable and articulable suspicion that Defendant was involved in criminal activity. "The Fourth Amendment provides that 'the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .'" *Terry v. Ohio*, 392 U.S. 1, 8 (1968) (quoting U.S. Const. amend. IV). "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as

6

to the homeowner closeted in his study to dispose of his secret affairs." *Id*. at 8-9. "[C]ourts still retain their traditional responsibility to guard against police conduct . . . which trenches upon personal security without the objective evidentiary justification which the Constitution requires." *Terry*, 392 U.S. at 15. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded. *Id*.

There are however, instances in which "the governmental interest" "justifies official intrusion upon the constitutionally protected interests of the private citizen." *Terry*, 392 U.S. at 21. Where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances. *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000); *see also*, *Terry*, 392 U.S. at 10. In order to justify suck an intrusion under *Terry*, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id*. at 21

The *Terry* doctrine applies to investigative stops of moving automobiles. *Id*. "In evaluating the constitutionality of a *Terry* stop, we engage in a two-part analysis of the reasonableness of the stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). We first determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which give rise to reasonable suspicion." *Id*. We look to the totality of the circumstances in answering this question. *Id*. "[I]n assessing the reasonableness of the stop, the facts are 'judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable

caution in the belief' that the action taken was appropriate?" *Hurst*, 228 F.3d at 757 (citations omitted). If we then decide that the basis for the *Terry* stop was proper, we must "determine 'whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.'" *Davis*, 430 F.3d at 354.

In *Hurst*, we upheld a finding of reasonable suspicion where an off-duty sheriff's deputy who had heard the distinctive description of a fleeing burglary suspect that was broadcast over the police radio, observed a vehicle matching the description at a location consistent with the time needed to travel to that point from the residence in question. *Id.* The police radio dispatch described a dark colored Thunderbird with front end damage and a missing grill that was seen heading southbound on US-127 near the home that had been burglarized. *Hurst*, 228 F.3d at 755. The sheriff's deputy stopped a dark blue Mercury cougar, heading eastbound on I-40 near the intersection of US-127, approximately 25 minutes from the home that had been burglarized. *Id.* There was testimony from the deputy making the stop that a Cougar and a Thunderbird "look practically alike." *Id.* at 757. The deputy described the two cars as "sister models . . . identical except for a few cosmetic differences." *Id.* We found that the officer that stopped the *Hurst* vehicle had knowledge of "specific and articulable facts, which taken together, certainly gave rise to reasonable suspicion of criminal activity." *Id.*

In *United States v. Thomas*, 11 F.3d 620 (6th Cir. 1993), we also upheld a finding of reasonable suspicion of criminal activity justifying the stop of the defendant Thomas' vehicle. The facts of the case are as follows. During a police interview, a shooting victim, Lawrence Williams

8

("Williams"), identified Thomas as the individual who shot him. *Id*. at 623. Williams gave the police a thorough description of Thomas, describing him as a "black male in his late 20's to early 30's, medium height, husky build, with medium length hair with a wave in it. *Id*. Williams also provided a detailed description of Thomas' truck, describing it as a "1978-1980 black Chevrolet pickup with large tires and rims, steps on the sides of the truck, and a temporary license plate tag in the window." *Id*. Williams further told the officers exactly where the defendant usually parked his truck, and identified the bar that defendant frequented. *Id*. A check of the computerized police records of the Cleveland Police Department revealed that defendant Thomas was in fact the named suspect in the shooting assault, and that a guard at the bar where the incident occurred had corroborated the victim's story. *Id*. The next day, on the basis of this information, the officers, acting undercover, drove to the parking lot identified by Williams as the place where the defendant usually parked his truck. *Id*. at 624. The officers observed a truck fitting the description of Thomas' truck, and a check of the tag in the window revealed that the truck was in fact registered to Thomas. *Id*. Shortly thereafter, the officers observed Thomas and defendant Dupree get into truck and drive off. *Id*. The officers followed the truck for a while and stopped the vehicle after a short time. *Id*. Officers observed a revolver in plain view, and a further search of the vehicle yielded other weapons, drugs, and drug paraphernalia. *Id*. at 624-25.

At trial, the defendants sought to suppress all of the evidence found on their persons and in the truck, alleging that the stop and subsequent searches were illegal, but we upheld the stop on the grounds that the police officers "had specific and articulable facts which constituted a reasonable suspicion that defendant Thomas had committed the felonious assault on Lawrence Williams." *Id*.

at 628. In reaching this conclusion, we relied upon a number of factors, including the fact that the officers had the victim's information corroborated by an earlier police report that included an eyewitness account, and the fact that the officers observed the truck fitting the description of defendant Thomas' truck, in the exact location specified by the victim. *Id*.

In yet another case, *United States v. Townsend*, 330 F.3d 438 (6th Cir. 2003), we upheld a finding of reasonable and articulable suspicion where the police, in stopping the defendant Townsend, relied upon numerous factors including: 1) the fact that Townsend had just bought a large quantity of ingredients known to be used in the manufacture of methamphetamine; 2) police knew the color, model, and tag number of Townsend's vehicle, as well as the direction in which he was traveling; 3) that the car had recently been involved in a chase relating to the theft of anhydrous ammonia; and 4) that Townsend had been involved in an explosion at an alleged methamphetamine lab). In reaching this conclusion, we found that the police officer's "knowledge of the alleged purchase of methamphetamine precursors, coupled with his contemporaneous observation of a car closely matching the description of the vehicle linked to that purchase, in addition to the information regarding Townsend's possible previous involvement in the illegal manufacture of methamphetamine, provided him with specific and articulable facts justifying the brief investigatory stop." *Id*. at 441; *see also United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (where an en banc majority of this Court held that officers had a reasonable suspicion to stop Erwin because he and his vehicle matched a dispatch description).

This case differs significantly from those cited above where the police relied upon numerous specific details in identifying the vehicle and suspect before initiating the stop. In contrast to the

those cases, the officers in the present case, in stopping Defendant's vehicle, did not rely upon specific and articulable facts which taken together, give rise to a reasonable suspicion of criminal activity. Instead, the officers in the present case stopped a car that was a different make and model from that being sought, traveling in the wrong direction, and that was driven by an individual who did not match the physical description of the suspect. We therefore believe that the district court's ultimate legal conclusion that there was a reasonable and articulable suspicion justifying the stop of Defendant's vehicle was not supported by the evidence in the record.

As a preliminary matter, Officer Rogers should never have stopped Defendant's car in the first place because the vehicle differed in significant ways from that described in the police broadcast, and was traveling down the street in the wrong direction. At 6:35:40 p.m, Officer Plumber radioed that he and Officer Lohman had just seen a man matching the description of the suspect in a green BMW traveling westbound on Esmonde Street toward Quebec Road. Within fifty seconds of the broadcast, Rogers stopped a green Dodge Neon traveling eastbound on Esmonde Street away from Quebec Road. The fact that the green car was a BMW was repeated three times over the police radio. The direction of travel was repeated twice. A green BMW does not at all resemble a green Dodge Neon, but even assuming arguendo that one could reasonably mistake a Dodge Neon for a BMW (which is unlikely for anyone even a rudimentary knowledge of cars, let alone a police officer), it does not seem at all reasonable for a trained police officer engaged in a search for a suspect to mistake the direction that the vehicle was traveling. Moreover, the record reveals that despite Rogers' claim that he did not know where Quebec was in relation to Esmonde, Rogers and Stormes had in fact arrived at Esmonde Street via Quebec Road, so they certainly knew

11

where Quebec was in relation to Esmonde. More importantly, we find it highly unlikely that a police officer with Rogers' experience would not know basic directions or the layout of the streets where he was working.

The district court completely overlooked these significant discrepancies, choosing instead to uphold the stop on the basis of the fact that "the car defendant was driving was the same color as the car described in the police broadcast, it was of comparable size to a BMW, and it was the only green car spotted by the officers on Esmonde." (J.A. at 124.) The district court went on to conclude that "these facts permit a reasonable suspicion that defendant was the drug trafficking suspect who had fled the scene of the 'buy bust' and permitted the initial stop." (J.A. at 124.) We have never held that such meager facts constitute reasonable suspicion. By the district court's rationale, police would have been allowed to stop every small green car driving up and down Esmonde in an effort to find the suspect, completely ignoring the specific information that it was green BMW traveling westbound. The case law simply does not support this type of selective editing of the facts to make a determination as to reasonable suspicion. It was improper for the district court to omit significant details such as the incorrect direction of travel and incorrect make and model of car. The standard to be observed by the courts is "totality of circumstances," not totality of select circumstances.

Furthermore, our cases require that the police officers must rely upon "specific facts – available to the officers *before* they initiate contact – tending to show that the person stopped is in fact the person wanted in connection with a criminal investigation." *United States v. Hudson*, 405 F.3d 425, 438 (6th Cir. 2005) (emphasis in the original). In the present case, the specific facts available to the police at the time of the stop did not tend to show that Defendant was in fact the drug

12

trafficking suspect that police were searching for. The police in this instance did not just a have a vague description of a vehicle; they also had a rather specific description of the suspected drug trafficker, and Defendant's physical appearance differed significantly from that of the suspect. The description broadcast over the police radio was of a bald black male wearing a long sleeve gray or white t-shirt. The record clearly establishes that at the time he was stopped, Defendant was wearing a black short-sleeved t-shirt and he was NOT bald; therefore, Defendant should not have been stopped or should have been released immediately when the officers saw that he did not match the description of the suspect. The district court properly acknowledged that Defendant did not match the description of the suspect, but erred in its ultimate legal conclusion that there was reasonable and articulable suspicion justifying the stop despite these differences.

In reaching its erroneous conclusion, the district court improperly dismissed the significant difference in clothing by repeating Rogers' ludicrous suggestion that Defendant could have changed his shirt, finding that the "suspect may have discarded the shirt he was wearing while being chased." While it is certainly true that suspects may in some cases discard articles of clothing while attempting the elude police, that explanation is not reasonable in this circumstance because it completely ignores the fact that Plumber and Lohman had just spotted the suspect a scant few seconds before Rogers stopped Defendant's vehicle. Defendant would not have had the time or opportunity to discard his shirt in that short of a period of time, particularly considering that there were several police cars in that area of Esmonde Street. Stormes testified that there were at least three other police cars besides him and Rogers in that area. Thus, the police on the street would have either seen Defendant attempt to dispose of the shirt out the window of his vehicle, or would

13

have found the discarded shirt on the street or inside Defendant's car. Either way, the long-sleeved gray or white t-shirt would not have entirely disappeared in the fifty or so seconds between the time that Lohman and Plumber spotted the individual matching the suspect's description and the time it took for Rogers to stop the car.

Secondly, the district court embraced Rogers' dismissal of the fact that Defendant was not bald like the suspect in question by suggesting that Defendant had a receding hairline. A review of the black and white police mug shot shows, however, that at the time of the stop, Defendant had a full head of hair. No reasonable person would mistake Defendant for someone who was bald. In fact, on cross examination, when asked how he would describe Defendant's hair over a police radio, Rogers testified that he would have said that Defendant "has a receding hairline, slight afro." (J.A. at 71.) Stormes testified that he would describe Defendant's hair as "black short hair." (J.A. at 99.) Notably, the district court does not offer an explanation for the discrepancy concerning the hair, but merely determined that "this discrepancy, standing alone, is not sufficient to dispel a reasonable, articulable suspicion that defendant was engaged in criminal activity . . . ." (J.A. at 123.) The reality, however, is that this discrepancy did not "stand alone" but instead stood along side all the other discrepancies that were overlooked or ignored.

We believe that in light of a record devoid of any evidence at all that Defendant had the time or opportunity to change his shirt or to shave off all his hair, the district court erroneously engaged in speculation in order to find that Rogers' testimony was credible and that there was reasonable and articulable suspicion justifying the stop of Defendant's car – where the record reveals that Rogers could clearly see from his vantage point on the street that Defendant did not match the physical

14

description of the suspect before he approached the car. Rogers testified that he could clearly discern Defendant even before he approached the vehicle. Upon seeing that Defendant did not match the description of the suspect, Rogers should have immediately let Defendant go. At that point, even had it been reasonable to stop the green Dodge Neon traveling in the wrong direction from the green BMW, the stop certainly ceased to be reasonable once Officer Rogers could visibly see that the driver did not match the description of the suspect being sought because Rogers did not have reasonable and articulable suspicion to believe that Defendant was engaged in criminal activity.

Even giving the district court and the police officers on the scene the benefit of the doubt, the facts still do not support a finding of reasonableness where, within seconds of Rogers having stopped the Defendant, Lohman radioed that the officers had stopped the wrong car. She stated that the vehicle the officers had stopped was not the vehicle she had seen. Furthermore, upon request from the dispatcher, Lohman repeated that Rogers and Stormes had the wrong car, and clarified that the vehicle she had seen was traveling westbound, not eastbound. At this point, reason dictates that Rogers should have released Defendant and proceeded in the opposite direction searching for the suspect and vehicle Lohman identified.

Critically, Rogers testified that he did not hear Lohman's broadcast that he had the wrong car until after he had the bag in custody, but that is not consistent with the time line of the broadcasts that came over the police radio. Plumber's broadcast regarding the individual fitting the suspect's description in the BMW was broadcast at 6:35:40. The broadcast that Rogers had stopped the car came at 6:36:30, less than a minute later. Lohman's broadcast that the car stopped was not the one

15

she and Plumber was talking about came at 6:36:50, only twenty seconds after the broadcast about a car being stopped. That means that the entire scenario, including Rogers signaling to Defendant to stop, pulling his weapon, walking over to the car, the back and forth conversation between Rogers and Defendant regarding the contents of the bag, and Defendant exiting the vehicle would all have had to occur in the span of no more than one minute and twenty seconds. The district court specifically found that Rogers' account of the events was credible and was consistent with the time line of events and that Rogers did not know when he approached the suspects's car that he had stopped the wrong car; but we find the exact opposite. We find that the evidence in the record supports the contrary conclusion that the time line is not at all consistent with Rogers' account, and that the district court's credibility determination was clearly erroneous.

III.

Having determined that there was no reasonable and articulable suspicion justifying the stop of Defendant's vehicle, we further find that the evidence found inside the paper bag and the vehicle should be excluded as "fruits of the poisonous tree." The principle remedy for violation of Fourth Amendment rights is the exclusion of the evidence from the criminal trial of the person whose rights were violated. *Mapp v. Ohio*, 367 U.S. 643 (1961); *see also, Joshua v. DeWitt*, 341 F.3d 430 (6th Cir. 2003) (applying the exclusionary rule to an improper traffic stop situation). "The exclusionary rule is a judicial remedy that operates to 'deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures,' as well as to maintain the integrity of the judicial process." *Id.* at 450 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)); *see also Terry*, 392 U.S. at 12 ("[T]he rule excluding evidence seized in

16

violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct . . . Thus its major thrust is a deterrent one, [] and experience has taught that without it the constitutional guarantee against unreasonable searches and seizures would be a 'mere form of words.'"). "The rule's application is limited to those instances where its remedial objectives are thought most effaciously served." *Joshua*, 341 F.3d at 450 (internal citations omitted).

We hold here that the evidence was seized as the result of an unlawful stop and detention, and therefore should have been suppressed. *See id.* The evidence inside the brown paper bag and inside the car was obtained only because Officer Rogers unlawfully stopped Defendant's car where he had no reasonable and articulable suspicion that Defendant was engaged in criminal activity. Thus, the evidence obtained as a result of the stop should be excluded.

IV.

For the foregoing reasons, we **REVERSE** the district court and **VACATE** Defendant's sentence and conviction.

No. 04-3894

SUHRHEINRICH, Circuit Judge, dissenting. As an appellate court, we are required to give due deference to the trial court's factual findings. Because I believe the majority has conducted de novo review of the facts, I respectfully dissent.

A bedrock principle of appellate procedure is that "appellate court[s] . . . do not reweigh the evidence presented below for the purpose of determining which scenario has the greater possibility of being true." *United States v. Navarro-Camacho*, 186 F.3d 701, 707-08 (6th Cir. 1999); *cf. Illinois v. Gates*, 462 U.S. 213, 232 (1983) ("[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules"); *United States v. Dotson*, 49 F.3d 227, 229 (6th Cir. 1995) ("A reviewing court accords great deference to a lower court's independent determination of probable cause.");.

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985). Moreover, "[t]here is no *de novo* appellate review of factfindings and no intermediate level between *de novo* and clear error, not even for findings the court of appeals may consider sub-par." *United States v. Microsoft Corp.*, 253 F.3d 34, 117 (D.C. Cir. 2001) (per curiam); *see Amadeo v. Zant*, 486 U.S. 214, 228 (1988) ("The District

18

Court's lack of precision . . . is no excuse for the Court of Appeals to ignore the dictates of Rule 52(a) and engage in impermissible appellate factfinding.").

The majority correctly identifies the standard of review for a suppression hearing as clear error. *See Inwood Labs., Inc., v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982). The Supreme Court has explained that the deference accorded to district courts "rests upon the unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and to weigh the evidence." *Id.* Thus, "unless an appellate court is left with the 'definite and firm conviction that a mistake has been committed,' it *must* accept the trial court's findings." *Id.* (emphasis added) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

We are called on to review the evidence "in the light most likely to *support* the district court's decision." *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994) (emphasis added) (internal quotation omitted). Instead, the majority supplants the district court's finding of reasonable suspicion by challenging the sufficiency of the facts and what was reasonable for the officers, and the district court, to determine, and attempts to divorce these facts from the time, place, and manner in which they occurred. The majority has imputed the officers with knowledge of the direction of the suspect vehicle's travel simply because the officers had arrived at Esmonde Street via Quebec Road, and because dispatch broadcast the suspect vehicle's direction of travel twice. In so doing, the majority ignores the fact that the officers were in fact unfamiliar with the area, and that the officers were on foot and out of earshot of the radio in their squad car at the time the second broadcast was made. The majority also concludes that a reasonably trained officer could not mistake a BMW for a Dodge Neon. Again, this conclusion completely ignores the facts found by the district

19

court. Not only was Jackson's vehicle the only one traveling on Esmonde, but Officer Plumber reported that the suspect vehicle was "*possibly* a BMW" and "*looks like* a BMW." (Emphases added.)

The specific facts articulated by the district court to sustain reasonable suspicion were (1) that Jackson was driving a green vehicle in the vicinity of the "buy bust" where the suspect had been last seen less than one minute earlier, (2) that Jackson's vehicle was of comparable size to a BMW, (3) that Jackson's green Dodge Neon was the only vehicle traveling on Esmonde Street at that time, and (4) that Jackson matched the racial description of the suspect. These are not, as the majority describes them, "meager" facts.

We have previously upheld a *Terry* stop where the suspect vehicle could not be described and the wrong vehicle was stopped due to a misunderstanding of the radio communication. *See Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813-14 (6th Cir. 1999). The Seventh Circuit has found reasonable suspicion where (1) the defendant matched the racial description of the suspect, (2) the vehicle description was similar (a purple SUV with shiny rims), and (3) the defendant was stopped fifteen minutes after the shooting in an area eight blocks away. *See United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003). Similarly, the First Circuit has found reasonable suspicion to stop a defendant's white Lexus even though the suspect's vehicle was described as "a white or light colored late-model car, *possibly* a Buick or Oldsmobile." *United States v. Jones*, 187 F.3d 210, 216-17 (1st Cir. 1999) (emphasis added); *see also Creighton v. Anderson*, 922 F.2d 443, 450 (8th Cir. 1990) (finding reasonable suspicion even though the defendant's vehicle had a slightly different color and make from the suspect's vehicle).

The majority focuses heavily on the discrepancies between the description of the vehicle and the direction of its travel as a basis for its reversal. However, "[t]he court cannot determine [whether] an officer had reasonable suspicion on the basis of a factor on which the officer did not actually rely." *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). The officers did not know that the suspect vehicle was in fact a BMW. The description supplied by Officer Plumber reported that there was a potential suspect in a green vehicle—"*possibly* a BMW"—traveling on Esmonde toward Quebec.[2] (Emphasis added.) Within twenty-five seconds of hearing the first dispatch broadcast, Officer Rogers, now on foot, saw a green vehicle approaching; it was on the same block as the reported suspect vehicle and was in fact the only vehicle traveling on Esmonde Street. Furthermore, other officers in the area also on foot were shouting at Officer Rogers to stop the oncoming green vehicle, indicating a joint consensus that they too believed the vehicle to be the suspect vehicle. *See Braggs*, 23 F.3d at 1049 ("Reasonable suspicion can be based upon police officers' own observations or upon the collective knowledge of other officers.").

Additionally, Officer Rogers was unfamiliar with the area because it was not his usual beat. As a result, he was unable to make a split-second determination as to the vehicle's direction. Under such circumstances, equipped with only a general description of the suspect vehicle and being unsure of the direction the suspect vehicle was traveling, Officer Rogers could not have dispelled his reasonable suspicion that Jackson's vehicle was the suspect vehicle without stopping Jackson.

---

[2]Without an additional description of the suspect vehicle, there is no basis to conclude, as the majority has, that an officer could not reasonably mistake a Dodge Neon for a BMW. *Compare*, *e.g.*, http://members.tripod.com/~SeCrEtZoNe1/bmw9.jpg (last visited July 6, 2006) (picture of a green BMW), *with* http://www.qssx.com/neonhi1.jpg (last visited July 6, 2006) (picture of green Dodge Neon).

Moreover, regardless of whether Officer Rogers knew what direction the suspect vehicle was traveling, the majority ignores the possibility that the vehicle could have easily changed direction. A vehicle's direction of travel is not restricted to a fixed path, but rather is capable of being changed at a moment's notice. Applying the majority's logic more broadly, future suspects would be able to avoid detention, and subsequent arrest, by simply turning the wheel of their car and driving in the opposite direction .

The majority also focuses on the description of the suspect as a basis for reversal. However, following the broadcast of the suspect vehicle's description, the officers' focus switched from locating a person to locating a green vehicle. Applying common sense and considering the pragmatic nature of police searches, it was necessary for the officers to identify and stop a suspect vehicle *before* identifying the suspect. The obvious mobility of a vehicle and the reality that the officers would not likely get another chance to stop and investigate the suspect vehicle only added to the exigency. Despite the inconsistencies between the suspect's reported clothing and hairline and Jackson's actual physical characteristics, the unique circumstances that placed Jackson's green vehicle—the only vehicle traveling on Esmonde—in the vicinity of the "buy bust" less than one minute after Officer Lohman's initial observation of the suspect green vehicle firmly ground Officer Rogers' reasonable suspicion. We have held that the police had reasonable suspicion to stop a suspect vehicle where the description of the defendant's vehicle matched the suspect's, and the stop could have produced evidence of a crime, even if the police did not have reasonable suspicion to believe that the defendant was the suspect. *See United States v. Marxen*, 410 F.3d 326, 331-32 (6th Cir. 2005).

Minor mistakes, such as the description of a suspect vehicle, its direction of travel, or a suspect's clothing, do not automatically vitiate an officer's finding of reasonable suspicion. *See Houston*, 174 F.3d at 814. Law enforcement officers are "regularly forced to make critical decisions under extreme pressure." *Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995) (internal quotation omitted). This is why the standard for a *Terry* stop is *reasonable* suspicion and not *arrant* suspicion. The only question that need be answered is whether a reasonable officer could conclude that a *Terry* stop was justified based on articulable facts and his knowledge, training, and experience as an officer. To hold law enforcement to a more exacting standard is to undermine the purpose behind the Supreme Court's decision in *Terry*. *See Terry v. Ohio*, 392 U.S. 1, 22-24 (1968).

The district court's decision does not, as the majority insists, purport to give police the authority to stop every vehicle traveling on Esmonde. More accurately, the district court's decision finds reasonable suspicion to stop a suspect vehicle when the vehicle is the same color and size of the reported vehicle, when the vehicle is spotted within twenty-five seconds of dispatch's initial broadcast of the vehicle's description, when the suspect vehicle is the only vehicle traveling on the same street—and the same block—as the reported vehicle, and when the driver matches the racial description of the suspect.

Viewing the facts in a light most likely to support the judgment below, I conclude that the district court's findings were not clearly erroneous. Accordingly, I would affirm.

For these reasons, I respectfully dissent.

23