RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0155p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WILBERT JAMES SMITH, JR.,

*Defendant-Appellant.*

No. 22-1055

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cr-00185-1—Janet T. Neff, District Judge.

Decided and Filed:  July 24, 2023

Before:  GIBBONS, READLER, and DAVIS, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Eric Eckes, PINALES, STACHLER, YOUNG & BURRELL, CO., L.P.A., Cincinnati, Ohio, for Appellant.  Austin J. Hakes, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

## OPINION

───────────────

CHAD A. READLER, Circuit Judge.  Wilbert Smith was convicted of committing firearm and drug-related offenses.  Most of the incriminating evidence was discovered during a search of Smith's vehicle following a stop by law enforcement.  Smith believes the search violated the Fourth Amendment, meaning the evidence should have been suppressed.  We agree with the district court that there was reasonable suspicion to support an investigatory stop of

Smith's car and, as a result, that the search was lawful.  Accordingly, we affirm the denial of Smith's motion to suppress.

I.

Early one morning, a man named D.B. and a woman named Sharon left a Detroit bar together.  D.B., the driver, believed they were being followed by a silver sedan.  At 1:41:01 a.m., a nearby traffic camera captured D.B. driving through an intersection, followed by the silver sedan less than a minute later.  Roughly three minutes later, about two and a half miles from the intersection, an individual in a silver sedan shot D.B. in the stomach.  D.B. drove off, chased by the silver sedan.  Eventually, D.B. crashed and sustained non-fatal injuries.

A police investigation ensued.  Surveillance video from the place of the shooting captured muzzle flashes coming from a silver sedan one witness described as "look[ing] like a Chevy Malibu."  The only silver sedan that could be placed in D.B.'s proximity around the time of the shooting was Wilbert Smith's Chevy Malibu.  D.B. later picked Smith out of a photographic lineup as someone he had previously "hanged with" and had a "beef [with] in the past."  D.B. also had a vivid memory of seeing Sharon arguing with the mother of Smith's child at a bar.  (Sharon, Smith reminds us, denied getting into any altercations that night).

Smith's car was consequently tagged in Michigan's Law Enforcement Information Network.  The grounds for doing so were twofold.  One, the police "wanted [Smith's] side of the story."  Two, they wanted to confirm that Smith's vehicle was involved in a shooting.  The tag told law enforcement statewide to be on the lookout for Smith's car.  It warned that the car's occupants were armed and asked any officer who came upon the vehicle to "hold [it] & arrest all occupants."

Three days later, an officer pulled Smith's car over in western Michigan, near the Indiana border.  The officer asked Smith to exit the car.  When he did, the officer frisked Smith for weapons.  Smith told the trooper there was a gun in a case in the car.  The trooper performed a "protective sweep" of the areas within a driver's reach.  The sweep turned up a handgun with a chambered bullet as well as a baggie containing fentanyl and heroin.  The trooper then arrested Smith.

Following his indictment by a federal grand jury, Smith moved to have the gun-and-drug-related evidence suppressed as fruits of an unreasonable search.  The district court denied the motion on the grounds that the police had reasonable suspicion to stop Smith and perform a limited search.  Smith pleaded guilty but preserved his right to challenge the suppression ruling on appeal.  We turn to that issue now.

II.

The Fourth Amendment offers a familiar guarantee:  people are to be free from "unreasonable searches and seizures" by the government.  U.S. CONST. amend. IV.  That pledge is primarily enforced through "the exclusionary rule," a court-adopted principle that "requires trial courts to exclude unlawfully seized evidence in a criminal trial."  *Utah v. Strieff*, 579 U.S. 232, 237 (2016).  Whether this right has been infringed on is typically addressed at a pre-trial suppression hearing in the district court.  Fed. R. Crim. P. 12(b)(3)(C).

In the spotlight here is the Law Enforcement Information Network bulletin issued by state officials.  If the bulletin was "issued on the basis of articulable facts supporting a reasonable suspicion that [Smith] has committed an offense," all seem to agree that the stop and search of Smith's car was "reasonable," and thus lawful.  *United States v. Hensley*, 469 U.S. 221, 232 (1985).  The district court concluded that the facts supported a finding of reasonable suspicion, a conclusion we review de novo.  *United States v. Prigmore*, 15 F.4th 768, 777 (6th Cir. 2021).  As for the factual findings supporting that decision, we review them for clear error.  *Id.*

Reasonable suspicion is not particularly difficult to establish.  *United States v. McAllister*, 39 F.4th 368, 373 (6th Cir. 2022); *cf. United States v. Arvizu*, 534 U.S. 266, 274 (2002) (noting reasonable suspicion is a less burdensome standard than probable cause); *United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009) (citation and quotation omitted) (explaining that probable cause requires "a fair probability that contraband or evidence of a crime will be found in a particular place.").  In a nutshell, there is reasonable suspicion to stop a car where officers, taking the totality of the circumstances, put forward "a particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (quotation marks omitted).  In doing so, officers cannot rely on "a mere hunch." *Id.* at 274 (quotation marks omitted).  But they can

"draw on their own experience and specialized training to make inferences and deductions." *Id.* at 273–74.

Given the facts known to the officers at the time Smith's car was tagged in the Law Enforcement Information Network, the reasonable suspicion standard was satisfied here. They knew a silver sedan that, in an observer's words, "look[ed] like a Chevy Malibu," was involved in D.B.'s shooting. They discovered a silver sedan was on the same road as D.B. around the time of the shooting—Smith's Chevy Malibu. When the officers showed D.B. a photographic lineup, D.B. identified Smith as someone with whom he once feuded. What is more, D.B. added that he saw Sharon, his passenger at the time of the shooting, in a shouting match with Smith's girlfriend earlier that night. By any measure, the information available to the officers gave them "an objective basis for suspecting legal wrongdoing" involving Smith's car, clearing the low bar the officers faced. *Arvizu*, 534 U.S. at 273; *see also United States v. Marxen*, 410 F.3d 326, 331 (6th Cir. 2005) (upholding search of a getaway car "when the police ha[d] reasonable suspicion to believe only that the stop w[ould] produce evidence of a crime," even though no witnesses placed the driver at the crime scene).

Smith would have us hold otherwise. He begins by highlighting *United States v. Jackson*, 188 F. App'x 403 (6th Cir. 2006). But the facts there are not the facts here. In *Jackson*, "the officers . . . stopped a car that was a different make and model from that being sought, traveling in the wrong direction, and driven by an individual who did not match the physical description of the suspect." *Jackson*, 188 F. App'x at 409. Finding reasonable suspicion in that circumstance would have blessed officers "stop[ping] every small green car driving up and down [the street], in an effort to find the suspect, completely ignoring the specific information that" they were given. *Id.* at 410. Smith's case is much simpler. His car matched the suspect car's description, the car at issue was traveling toward the place where the shooting took place, and there was evidence of a contentious history between Smith and the victim.

True, as Smith notes, the Fifth and Seventh Circuits have in some respects dichotomized reasonable suspicion on temporal grounds, requiring a higher showing when officers are investigating completed past crimes than when investigating ongoing ones. *United States v. Alvarez*, 40 F.4th 339, 347 (5th Cir. 2022); *United States v. Lopez*, 907 F.3d 472, 485 (7th Cir.

2018).  Whatever the wisdom in that approach, for today's purposes it is enough to say that it is not one we have followed.  *See United States v. Jones*, 953 F.3d 433, 436 (6th Cir. 2020) (quoting *Hensley*, 469 U.S. at 228) ("[T]he 'proper way' to identify the 'precise limits on investigatory stops to investigate past criminal activity' is to 'apply the same test already used to identify the proper bounds of intrusions that further investigations of imminent or ongoing crimes.'").  Instead, we have understood that reasonable suspicion depends on an examination of the totality of the circumstances.  *See Marxen*, 410 F.3d at 330 ("[T]he time between the commission of the crime and the subsequent stop is simply one factor for this court to consider . . . .");  *see also United States v. Hudson*, 405 F.3d 425, 437 (6th Cir. 2005).  The district court did exactly that in denying Smith's motion to suppress.

Regardless, this case clears any heightened bar Smith might have us impose.  Officers knew the color and type of car they were looking for, that the recent shooting victim had a complicated relationship with the owner of a car matching that description, and that the vehicle was seen driving close to the victim's vehicle mere minutes before the shooting.  *See Marxen*, 410 F.3d at 329–30 (concluding there was reasonable suspicion when an "eyewitness described the getaway car as one either matching or closely resembling Marxen's vehicle in make, model, and color" and provided a partial license plate match).  Contrast this record with the one in *Alvarez*, a case relied upon by Smith.  There, during "a state-wide 'roundup'" of people with outstanding warrants, officers sought out and arrested "a Hispanic male" that they thought "may be in the area" and may be riding a bicycle with large handlebars because "he had run from officers" on such a bicycle in the past.  40 F.4th at 343.  *Cf. Hudson*, 405 F.3d at 437 (concluding a description of "black males" in either a "black or blue" car was not specific enough to support reasonable suspicion weeks after a robbery took place (discussing *United States v. Rias*, 524 F.2d 118, 121 (5th Cir. 1975))).  Or *Lopez*, where officers relied solely on the uncorroborated tip of an informant who "stopped communicating with law enforcement and rebuffed their efforts to contact him" after being released from custody.  907 F.3d at 476.  The officers here, by comparison, had "reasonable suspicion to believe that the vehicle stopped was involved in criminal activity and the stop may produce evidence of a crime."  *See Marxen*, 410 F.3d at 332.

Moving from legal arguments to factual ones, Smith estimates that—by his calculations—his vehicle would have needed to travel from the intersection at which it was initially spotted at nearly fifty miles per hour on streets with speed limits far lower to intersect D.B.'s vehicle at the place of the shooting. As the government notes, however, this point was not drawn to the district court's attention, a step Smith was required to take. *See United States v. Husein*, 478 F.3d 318, 335 (6th Cir. 2007) ("A party may not by-pass the fact-finding process of the lower court and introduce new facts in its brief on appeal." (alterations omitted)).

Nor, in any event, are Smith's calculations beyond reproach. Using the intersection where his vehicle was first captured by traffic cameras as a starting point, Smith simply takes the distance his car purportedly traveled to the scene of the shooting and divides that figure by the time it took to get from place to place. He then compares that average speed to the speed limit on the roads he could have traveled. Smith does not consider any of the many complicating factors. For instance, Smith may have been travelling at a faster rate. After all, someone capable of attempted murder is likely also capable of speeding or running a stop sign. Likewise, Smith may be using the wrong duration between events. All we know about the shooting is that it happened at "approximately 1:45 am." That approximation does not rule out Smith having an extra minute to arrive for a 1:46:00 a.m. shooting. If he did have an extra minute (or more), the speed necessary to get from place to place would be more in line with the speed limit. All things considered, it was not clear error to rely on testimony that "it would be possible for a car to cover [the] distances" Smith's car was suspected to have traveled.

### III.

Because we conclude that the district court did not err in finding there was reasonable suspicion, we conclude that the stop was lawful. Accordingly, we need not reach Smith's subsidiary argument concerning suppression of his statements as fruit of the poisonous tree.

For the reasons above, we affirm the district court.